Walworth, Chanccellor.
The writ of error in .this case is brought for the purpose of settling the question as to the right of the aldermen of the city of New-York to exercise the duties of justices of the peace in holding the court of general sessions in that city, under the act of the 14th of May, 1840. In the case of The People v. The Mayor and Aldermen of New-York, (25 Wend. Rep. 9,) where the question arose as to the right of those officers to exercise the duties of judges of the court of common pleas under the provisions of the constitution of this state, I endeavored to show that the aldermen of the city were, at the adoption of the new constitution, elective judges of that court, and were therefore embraced by the section of the constitution which provided that all officers theretofore elective by the people should continue to be elected. And that this section, therefore, as to these officers, formed an exception to the clause of the constitution requiring all judicial officers, except justices of the peace, to be appointed by the governor with the consent of the senate, and that judges of the county courts should hold their offices for five years ; in the same manner that another section making certain elective officers ex officio members of this court, was an exception to the general provision as to the mode of appointing judicial officers. I then showed, by a reference to the city charter that the aldermen of New-York had not only been justices of the peace, but also elective judges of the court of common pleas or mayor’s court, for more than a century and a half, And that the term alderman had been used to designate an offi *388 cer having judicial as well as civil power, in England, for a period which extended back even beyond the Norman conquest. I may now add, that the introduction of the laws of Normandy into England was not likely to deprive the aldermen of their judicial powers; for a similar class of elective judicial and municipal officers had existed in the cities of France, under the name of Echevins, or aldermen, from the earliest period of the French history. And their election by the citizens to discharge such duties was recognized in the capitularies or statutes of Charlemagne. (6 Guyots Repert. 599 ; Merlin’s Repert. Art. Echevins.) But as.the judgment of the supreme court was affirmed here by a tie vote, the right of the mayor and aldermen of New-York to sit as judges of the county or mayor’s court of that city is still undecided by this court.
That question, however, does not arise in the present case ; for the aldermen never claimed the right to sit in the courts of general and special sessions of the peace as judges of the county court; but in their character of justices of the peace of the city of New-York. And in the case of Clark v. The People, (26 Wend. Rep. 599,) this court almost unanimously decided that the clause in the constitution requiring judicial officers to be appointed by the governor with the consent of the senate did not apply to justices of the peace in cities. The courts of general and special sessions of the peace throughout the state were, at the adoption of that constitution, holden by judicial officers in their characters of justices of the peace only ; the judges of the courts of common pleas having a distinct commission for that purpose in the general commission of the peace for each county. The courts of common pleas only were called county courts at that time. And though the courts of oyer and terminer and the courts of general sessions of the peace were in fact county courts, I do not believe the framers of the constitution intended to declare that the judges- of these two courts should hold their offices for five years. That the first legislature-which assembled under the-new constitution did not so understand it, is evident from the fact that they authorized courts *389 of general sessions of the peace to be holden, in certain cases, by justices of the peace; and courts of oyer and terminer in New-York to be holden by aldermen. I have no doubt, therefore, of the power of the legislature to direct courts of oyer and terminer, and courts of general and special sessions of the peace, to continue to be held by the same class of judicial officers; although they do not all of them now derive their authority to act as justices of the court of oyer and terminer or of general sessions, by an appointment of the governor and senate. That the existence of such a power was,not doubted by those who voted for the act of May, 1840, for the better organization of the criminal courts of the city and county of New-York, is evident from the fact that the third section of that act not only authorizes, but makes it the duty of two of the aldermen to attend with the recorder, or one of the judges, for the purpose of holding a court of special sessions of the peace for the trial of a certain class of criminal offences ; which court of special sessions is as much a county court as the court of oyer and terminer or general sessions, although it is restricted in its jurisdiction to the trial of minor offences only. Any other construction of the constitution, indeed, vrould render inoperative and void the provisions of the revised statutes which authorize justices of the peace to hold courts of special sessions in other parts of the state, or to be associated with a county judge in forming a court of general sessions in the absence of a quorum of the judges of the court of common pleas. (See 2 R. S. 208, § 4 ; Id. 224, § 3.) The courts of general and special sessions in the city of New-York, in which aldermen of the city, in their characters of justices of the peace, were associated with the mayor, recorder, or the first judge, or an associate judge of the court of common pleas, appear, therefore, to have been legally and constitutionally organized, previous to the act of May, 1840. And it remains to be considered, whether that act has been constitutionally passed, and, if so, whether it has, either in terms or by necessary implication, deprived the aldermen of the city of the power which they had before pos *390 essed, from the time of the granting of governor Dongan’a charter in 1686, of being justices of the peace and associate justices in the court of general sessions of the peace for the city. {See Charter of 1686, § 9.)
As the fact, that the act of May, 1840, was not passed by a vote of two-thirds of the members elected to each branch of the legislature, was conceded by the attorney general upon the argument of this case in the court below, it is not necessary here to inquire in what way the question whether a law requiring a vote of two-thirds has been passed by a constitutional majority, is to be tried or determined. I am inclined to think, however, Justice Bronson is right in supposing that, to give full effect to the provision of the constitution requiring a vote of two-thirds of the members of each house to pass certain statutes, courts must look behind the printed statute book, in some way, for the purpose of ascertaining whether this constitutional provision has been complied with ; and that the certificate of the secretary of state cannot be considered as conclusive upon the question that the law was passed by a constitutional majority. For it could never have been the intention of the'legislature to give to the secretary of state the exclusive right of deciding whether' any of the provisions of a statute, which had bfeen passed by a majority vote only, required a vote of two-thirds. The certificate which the secretary is required .to endorse upon the bill, relates rather to the time when such bill became a law, than to the fact that it was passed by a constitutional vote of two-thirds ; when all or any of its provisions require that it should be passed by such a vote. And the revised statutes having only declared the certificate of the secretary to be conclusive evidence of the facts contained therein, if he does not certify that it was passed by two-thirds of /the members elected to each branch of the legislature, his certificate is not evidence that it was so passed •, when such an inquiry becomes material in reference to the validity of any of the provisions of the law. The legislature has declared by law that no bill shall be deemed to have passed by a two-third vote *391 unless it is so certified by the presiding officer of each house. And I am inclined to the opinion that such a certificate, rather than the certificate of the secretary of state specifying the time when the law was passed, is to be considered the only legal evidence that the bill was in fact passed with the assent of two-thirds of all the members elected to each branch of the legislature. (See 1 R. S. 156, § 3.) '
The question whether the legislature can, by a majority vote, enlarge, alter, or abridge the political powers, rights, or privileges of a municipal corporation, is one upon which judges as ■ well as legislators have frequently differed. And notwithstanding the elaborate argument of the counsel who opened this case, and the very able opinion delivered by Mr. Justice Bronson in the court below, I still adhere to the opinion expressed by me in this court in the case of Warner v. Beers, (23 Wend. Rep. 126,) that such legislation is not within the mischief which this provision of the constitution was intended to guard against; and therefore was not in the contemplation of the convention which framed this restriction, nor of the people of the state who adopted it. I therefore think the act of May 1840, was constitutionally passed by a majority vote ; although it does alter and to a certain extent abridge, the political rights of the corporators in this municipal corporation. For I admit that the election of their own magistrates has from time immemorial been considered by municipal corporations as an important political right. Most of the charters of municipal corporations in England, secured to the corporators that right, to a greater or less extent. And it was to deprive the corporators of London of such right, that Charles the second caused the proceedings upon a quo warranto to be instituted against them ; to enable him to control judicial proceedings within the city by destroying its charter of incorporation.
Having arrived at the conclusion that the legislature had the constitutional power to pass the act of May 1840, by a majority vote, without expressing any opinion as to the justice or expediency of thus interfering with chartered rights without the *392 consent of the corporation, with which question, as a court, we have nothing to do, I will proceed to examine the question to which the counsel who last addressed the court, confined his argument. Does the act of 1840, either in terms or by necessary implication, deprive the aldermen of the right, which was secured to them by the charter of the city, to sit as justices of the peace in the court of general sessions, in connection with the recorder and the judges whose appointment is provided for by that act ?
It is a general rule that statutes in the affirmative do not repeal or take away precedent acts or rights affirmative. Hence it was insisted, hy the counsel for the plaintiffs in error who last addressed us, that the act of 1840, did not in terms take away from the aldermen the right, which they before had, to sit in the court of general sessions. The 5th section of the act, abolishing the per diem allowance which had been previously allowed to aldermen while sitting in that court, also seemed to favor the conclusion that the legislature did not intend to deprive the aldermen of the right to sit and act as members of the court in connection with the recorder and judges, if they thought proper to do so without compensation. For there appears to have been no reason for declaring by statute that the aldermen should not receive a per diem allowance for discharging their duties as members of the court, if it was the intention of the legislature to deprive them absolutely of the power to sit or act as such members under any circumstances. The first section of the act, however, appears to have been framed with á view to exclude the mayor'and aldermen of the city from sitting in the court, altogether. While the 10th section has, in a most unaccountable manner, associated the mayor with the recorder and the other two judges of that court and the county judges, as a board of officers for the appointment . of the district attorney ; and this too, in direct violation of the provision of the constitution which directs that district attorneys shall be appointed by the county courts. But whatever construction might be put upon other provisions of this *393 act, it will be seen, by referring to the last section, that all the provisions of the revised statutes which authorized the mayor or aldermen to sit and act as members of the court of general sessions, are in terms repealed. And the general repealing act, of the 10th of December, 1828, had before repealed all other statutes on the subject. It is true the charter of 1730 remains as it was before it was altered by the acts which are thus repealed. But the 26th section of that charter, which authorized the mayor, recorder and aldermen, to hold courts of general sessions of the peace quarter-yearly, for a term not exceeding four days, would not authorize the mayor and aldermen to sit in the courts of general sessions, with the recorder and associate judges, as organized by the act of May, 1840.; wdiich courts are to commence on a different day of the week, and to continue four weeks, instead of four days. The result is, that the act of 1840 has absolutely deprived the mayor and aider-men of New-York of the power that they bad before exercised and enjoyed, of sitting in the court of general sessions of the peace, as justices thereof. I am therefore compelled to vote to sustain the decision of the majority of the justices of the supreme court. For the fact that one of the sections of the act of May, 1840, is admitted to be in direct conflict wnth the provisions of the constitution, does not render the other parts of that apt inoperative and void.
Paige, Senator.
The principal question in- the present case is, whether the act entitled “ An act for the better organization of the criminal courts in the city of New-York,” passed May 14th, 1840, comes within the 9th section of article 7th of the constitution of this state, requiring the assent of two-thirds of all the members elected to each branch of the legislature for the passage of every bill creating, continuing, altering or renewing anybody politic or corporate. It is not denied that the city of New-York is a body politic and corporate ; and I think it cannot be denied that the act in question, if constitutionally passed, alters the charter of that city. Th'e power to hold courts of general *394 sessions of the peace m and for the city and county of New-York, was a franchise vested in the corporation by the charter of 1730, to be exercised by the mayor, deputy-mayor, recorder and aldermen; and the act of May, 1840, by taking from the aldermen their right to sit as judges in that court, so far alters the body politic and deprives it of this franchise.
The act was passed as a mere majority bill. This appears from an examination of the journals of the senate and assembly, and from an inspection of the original bill on file in the office of the secretary of state. The latter is certified by the presiding officers of the two houses respectively, in the usual form of certifying majority bills. The revised statutes expressly declare, that “ no bill shall be deemed to have been passed by the assent of two-thirds of the members elected &c., unless so certified by the presiding officer of each house.” (1 R. S. 156, § 3.) We have a right I think to go behind the printed statute book in order to ascertain whether bills have been constitutionally passed. Judges, who are bound to take notice of a public act, must determine this question by an inspection of the record ; for nul tiel record cannot be pleaded to a statute. (Dwarr. on Stat. 630, 665 ; Com. Dig. tit. "Parliament," (R. 5 ;) The Prince’s case, 8 Cokers Rep. 28; Rex v. Robotham. 3 Burr. 1472.) This was the opinion of Senator Yerplanck, and President Bradish, as expressed by them in the case of Warner v. Beers, (23 Wend. 103;) and Mr. Justice Bronson arrived at a like conclusion in the present case when it was before the supreme court.
The principal question then recurs : Does the act of May 1840 come within the 9th section of the 7th article of the constitution 1 The language of the clause is, “ The assent of twothirdg of the members elected to each branch of the legislature, shall he requisite to every bill creating, continuing, altering or renewing, any body politic or corporate.” I have already stated it as my opinion that the act is one altering the charter of a corporation ; an act which, if sanctioned by us and carried into effect, must result in depriving the city of New-York of an *395 essential portion of its franchises. If this be conceded, there would seem to me to be no necessity for further enquiry in the present case. Not having received the assent of two-thirds of the members elected to each branch of the legislature, the act in question belongs to that species of irregular legislation which the constitution has expressly forbidden. It is therefore utterly void.
But it has been said that this clause in the constitution does not extend to public, but only to private corporations. Its terms, however, are comprehensive, explicit and unambiguous. They express, with a distinctness and force which to my mind is irresistible, an intention to include all corporations, whether public or private. Nor is any thing to be found in other parts of the instrument tending in the remotest degree to qualify the language, or restrain the universality of its application. What right then have we, who are obligated to maintain the constitution, to recognize and act upon an exception which its framers'have virtually told us they designed to exclude ; to interpolate words which they have omitted, or subvert the plain meaning of those they have introduced 1 At the period of the adoption of the constitution, and for a long time previous* there were in this state public corporations as well as private—a fact familiar to every member of the convention. If they had intended to exclude public corporations from the operation of the section under consideration, they knew how to express that intention, and would have done so.
It was said, in argument, that public corporations, such as cities and villages* are neither within the object, intent or mischief of this provision of the constitution « and it was asked, whether such was the ¿ase with respect to towns and counties I These, however, were not corporations at the time of the adoption of the constitution ; nor are they corporations even now, in the proper sense of that term. They are only quasi corporations, and wrere made such by the revised statutes. (See Revisers’ Notes, 3 R. S. 482, 490; 2 Kent’s Comm. 278; Jackson v. Hartwell, 8 John. Rep. 422 ; Hornbeck v. Westbrook, 9 *396 id. 73.) I am aware of the case of North Hempstead v. Hempstead, (1 Hopk. Ch. Rep. 288,) in which Chancellor Sanford said, that the towns of this state were bodies politic of a special character, with limited powers 3 and that, as such, they had capacity to hold property. But his opinion goes no further than to maintain, that where lands are granted to a town, by patent from the sovereign source of power, such patent creates it a body politic for the purpose of holding and managing the lands. Previous to the revised statutes it was repeatedly adjudged that towns and counties, as such, were not corporations. Accordingly, in Jackson v. Cory, (8 John. Rep. 385,) it was held, that the people of a county, not being a corporate body known to the law, could not take by grant from an individual. The same thing was virtually held in the subsequent case of Hornbeck v. Westbrook, (9 John. Rep. 73,) with, respect to a grant to the people of a town. As towns and counties, therefore, were not even corporations sub modo, at the time of framing the constitution, it is impossible that any argument applicable to the present case can be derived from the supposed inconvenience of subjecting them to the influence of the clause in question.
The learned chief justice of 'the supreme court in The People v. Morris, (13 Wend. 325,) and again in The People, ex rel. Lynch, v. The Mayor &c. of New-York, (25 Wend. 684,) has stated the distinction between public and private corporations. In the latter case, he said, that a public corporation relates exclusively to the public concerns of the corporators, and ££ is the embodyment of political power for the purposes of public government 3” while a private corporation, he further observed, <£ relates to the private rights and interests of the corporators” &c. It may be admitted that public corporations are not only useful instruments for the local government of dense populations, but that they are in most cases entirely unobjectionable. This admission, however, does not advance us one step in the demonstration that they are not within the meaning of the two-third clause in the constitution. The phraseology of that clause *397 is so clear, and at the same time so broad, that no one pretends it does not embrace public as well as private corporations. Upon what principle then, are we authorized to say that the intent was different from what the words themselves plainly import 1 How can xve know but that some members of the convention were unfriendly to the general course of previous legislation in regard to the chartering of cities and villages ; and therefore intended to subject all future legislation on that subject to the influence of this fundamental law 1 They may have thought some such restraint upon the legislature was important to protect the people of the country towns from certain extraordinary powers usually granted to municipal corporations ; as for example, the power of regulating the markets, thus enabling them to interfere with the freedom of trade.
But it appears from the debates in the convention, that the framers of the constitution adopted the clause in question with the distinct understanding that, as it now stands, it would embrace public corporations. To the objection there made that the clause, in terms, required a vote of “ two-thirds of the legislature to incorporate a village, bridge or turnpike,” it was answered, that “two-thirds wmuld never be wanting to incorporate a village or a turnpike whereupon an amendment limiting the clause to “ bank or moneyed institutions,” which had been previously proposed, was withdrawn, and the section in its present form unanimously adopted. (Carter & Stone’s Debates in Conv. 446.) Thus we are furnished wdth unequivocal affirmative evidence that the framers of the constitution intended, not to exclude public corporations, but to include them.
If it be allowed us to disregard the plain language of the constitution, and to go out of it in search of some conjectural intent of its framers which the words themselves do not express, we should be giving to the clause under consideration too broad a construction, in the opinion of many, were we to declare even that it includes all private corporations. The mischief intended to be guarded against, it has been said, was *398 the too rapid multiplication of bank charters, and the legislative corruption which their creation induced. Now, following the guidance of those who entertain this opinion, we should perhaps be bound to give such a construction to the provision as would exclude from its influence every private corporation, except those authorized to carry on the business of banking. And thus, not only public corporations, but also all turnpike, bridge, canal, rail-road, religious, insurance, manufacturing, literary and eleemosynary corporations, would be excluded from the operation of this clause of the constitution ; yet all these are private, except literary and eleemosynary corporations, and even they are so when founded and endowed by private benefactors. (2 Kent’s Com. 275, 4th ed.) It requires no gift of prophecy to foretell the results which must flow from such a course of adjudication by this court. Already have wre, by lending too unguarded an ear to arguments in favor of a latitudinarian mode of interpreting the constitution, struck out from the operation of the two-third clause, the identical corporations which are now admitted by every one to be within the evil intended to be remedied. The case of Warner v. Beers, (23 Wend. 103,) consummated this judicial miracle :—and if, countenancing another of these untoward attempts to free the legislature froto the restraints of fundamental law, 'we declare in the present case that all public corporations are also to be excluded from the operation of the section, it may as well be pronounced a dead letter at once. For one, I cannot consent to “ palter in. a double sense” writh any part of the constitution; especially not, with the section under consideration. Through no agency of mine shall it be made to “ keep the word of promise to the ear, and break it to the hope.” I trust that, in reference to the present case, this court will not hesitate to array itself in favor of the old and revered doctrine of strict construction—the only sotind and safe doctrine for the governance of either judges or legislators. If courts are allowed to depart from it, and venture upon the perilous *399 experiment of substituting, for the clear language of the instrument, their own notions of what it ought to have been or what its framers intended, there will be an end of written constitutions, and of all attempts to-fix limits to legislative and judicial power.
In this case, it appears to me, there can be no room for doubt, either as to the meaning of the words used in the constitution, or as to the intention of its framers. And to confirm the views already expressed, I will add, that the entire current of legislative precedent since the constitution went into effect, has been against the doctrine I have been combating. I do not now recollect an instance, during the period of my connection with either branch of the legislature, where, on a bill creating or altering the charter of a city or village, the question on its final passage was not put as upon a two-third bill. Some cases may have arisen where it was questioned whether the bill did in fact purport to alter the charter of a body politic or corporate 5 and if the conclusion arrived at was that it did not, it was probably treated as a majority bill. There have been general statutes passed in this manner, affecting all persons, as well natural as artificial; e. g. tax laws, and laws regulating the internal police of the state. But no case has occurred under the new constitution where a bill has been passed as a majority bill, on the concession being made that it proposed either to create, continue, alter or renew any particular public corporation.
If, as has been contended in the present case, the act of May 14th, 1840, does not take away the right of aldermen of the city of New-York to sit as judges of the court of general sessions, then there has been no usurpation by the plaintiff in error. But if otherwise, then the act is void, because it did not receive the assent of two-thirds of the members elected to each branch of the legislature. In either view, the plaintiff in error is entitled to judgment,'and the judgment of the supreme court should be reversed.
*400 Franklin, Senator.
The twenty-sixth section of the charter of the city of New-York, granted in 1730, confers upon aldermen the right of acting as members of the court of general sessions of the peace, by the following grant: “ And further, we, of our special grace, certain knowledge, and meer motion, have given, granted, ratified and confirmed, and by these presents do, for us, our heirs, and successors, give, grant, ratify, and confirm unto the said mayor, aldermen, and commonalty of the city of New-York, and to their successors forever, &c. that they, 'the said mayor, deputy-mayor, recorder, and aider-men of the said city, for the time being, or any four or more of them, (whereof we will the mayor or deputy-mayor, or the recorder of the said city, for the time being, to be one,) shall and may forever hereafter hold and keep four courts of general sessions of the peace in and for the said city and county of New-York.” In pursuance of this authority, and by virtue of several subsequent acts of the legislature, the aldermen have exercised the power conferred, and. have sat as judges of the court of general sessions of the peace, until the passage of the act of the 14th of May, 1840. The first section of that act declares, that the court of general sessions shall hereafter be held, and all the powers thereof exercised, by the recorder, and two judges to be appointed by th.e governor and senate. This infringes upon the powers of the aldermen granted to them under the charter, and by implication repeals that section of it to which I have referred. The charter and the act being inconsistent with each other, they cannot stand together; and a fair construction of the language of the act clearly indicates the design of the legislature to alter the entire organization of the court, and to exclude the aldermen from acting as members thereof. For, had it been the intention to continue the aldermen as members of the court, the above provision of the charter would have been embraced in the act j but a failure to do so, necessarily, and by all the rules of construction, excludes them from acting in that capacity.
That the city of New-York is a public corporation, and, as such, subject to the control of the legislature, cannot be ques *401 tioned. The antiquity of its charter, it having been granted by royal authority prior to the revolution, confers upon the corporation no greater privileges or rights than if its charter were of more modern enactment; and it must therefore be governed by' the same rules of construction, controlled by the same legislative proceedings, and guarded and protected by the constitution with as much care, as those which have been granted since the adoption of that constitution.
The ninth section of the seventh article of the constitution declares, that 16 The assent of two-thirds of the members elected to each branch of the legislature shall be requisite to every bill, creating, continuing, altering or renewing, any body politic or corporate.” But it is said that the act of May 14th, 1840, does not come within the provisions of the constitution requiring a two third vote, and that a majority was sufficient to pass the same. It is no doubt true, as was urged upon the argument of this case, and as was observed by several senators in the case of Warner v. Beers, (23 Wend. R. 126,) and by the chief justice of the supreme court in The People v. Morris, (13 id. 325,) and The People ex. rel, Lynch v. The Mayor &c., (25 id. 680,) that the main and prominent evil intended to be guarded against by the convention which framed the constitution, was the great accumulation of private corporations, and particularly of banks and insurance companies. But the plain and comprehensive language of the section does not, in my judgment, justify us in confining it to so narrow a limit; for if there is any power in language to convey ideas, the section under consideration is so clearly and forcibly expressed, that he who runs may not only read but understand. If it were the intention of the framers of the constitution to exclude public corporations from the operation of this section, and to leave them to be controlled at the pleasure of a bare majority of a quorum of each house, would they have declared that every bill creating, continuing, altering or renewing any body politic or corporate, should require the assent of two-thirds of the members elected to each branch of the legislature % *402 The debates in the convention which framed the constitution show, moreover, that this subject was distinctly brought before that body in the course of the discussion had npon the section in question, and formally passed upon. On referring to Carter and Stone’s Debates in Convention, (p. 446,) it will be seen, that when the report of the committee containing this clause came up for consideration, not only was it suggested that the provision would embrace public as well as private corporations, but a proposition was actually submitted to amend, by adding-after the word “any,” the words “bank or moneyed institution thus confining its operation to this particular class of corporations. It was urged then, as it has been in this case, that, as the section stood, it would require two-thirds of the members of each branch of the legislature to incorporate a village, bridge, or turnpike. But it was answered that two-thirds would never be wanting to incorporate a village or a turnpike, and the proposed amendment was thereupon withdrawn; thereby shewing clearly to pay mind that the convention, while they were anxious to throw restrictions around the increase, and at that time alarming increase, of moneyed corporations, were at the same time desirous to guard and protect all incorporated institutions from any alteration of their chartered rights, except in cases where those alterations were of so clear and palpable a character as to satisfy the minds of two-thirds of the members elected to the legislature that they should be made.
But in construing this clause of the constitution, we must be governed by those settled and fixed rules which have been established by our courts in reference to the construction of statutes, &c. What then are those rules 1 Dwarris, in treating upon this subject, says, that in the exposition of a statute, the leading clue to the construction to be made, is the intention- of the legislature, and that may be discovered from different signs. As a primary rulé, it is to be collected from the words; and when the words are not explicit, it is to be gathered from the occasion and necessity pf the law, these being the causes which *403 moved the legislature to enact it. (Dwarr. on Stat. 693.) The rule adopted by Lord Coke was, first to consider the true import of the words themselves, and then to refer to the old books and authors that wrote soon after the passing of the law. “ Great regard,” he says, “ ought, in construing a statute, to be paid to the construction which the sages of the law who lived about the time, or soon after it was made, put upon it, because they were best able to judge of the intention of the makers at the time when the same was made.” (2 Inst. 11, 136, 181.) Judge Story says, u the first and fundamental rule in the interpretation of all instruments is, to construe them according to the sense of the terms, and the intention of the parties ;” (1 Story’s Com. on Const. 383 ;) and Blackstone says, the intention of the law is to be gathered from the words, the context, the subject matter, the consequences and the effects, or the reason and spirit of the law. (1 Bl. Com. 59, 60.)
Applying, then, these general principles to the case now under review, we have in the first place the words of the constitution, which are as general as the language can furnish ; for the words every and any cannot be made to signify some, to the exclusion of others, but must be taken in their common acceptation, and according to the meaning which is usually attached to them. Thus interpreted, they admit of but one application, and must apply and have reference to every species of corporations, whether public or private. Again, if the words were of doubtful construction, the intention of the convention is evident from the debates upon this particular clause of the constitution, to which I have referred, and that must be regarded as one of the signs by which we must be governed in its construction. The sense of the terms and the intention of the parties are to my mind clearly evident from the views which I have already taken, and fully justify the conclusion that the act of 1840 was of that character which required the assent of two-thirds of the members elected to *404 both houses of the legislature. That such has been the construction put upon it by the framers of our laws, is evident from the fact, that from the time of the adoption of the constitution in 1822, down to the present, most of the acts similar in character to the one now under consideration have been passed in accordance with this view of the constitution ; and the exceptions only serve to establish the generality of the rule.
One of the points submitted by the plaintiff in error was, that the act of May 14, 1840, was not certified in the printed volume published by the state printer, nor in the original, to have been passed by the assent of two-thirds of each house; and that, in point of fact, as appears by the journal, it was passed in each house by a less vote. In order to determine this fact, it becomes necessary to resort to other evidence than that which the printed volume affords 5 for, in consequence of the form in which the statutes are printed, it does not appear whether it was passed as a two-thirds or majority bill. I have been unable to find any cases in our own courts having a bearing upon this point, or indicating the manner in which this proof ought to be made, except- the incidental opinions expressed by several senators in the case of Warner v. Beers. But Ch. J. Pratt held, in Rex v. Jeffries, (1 Strange, 446,) that it was competent to examine the parliament rolls to correct an error in the printed copy of the statutes j and Lord Mansfield held a similar doctrine in the case of Rex v. Robotham,, (3 Burrows, 1472.) If, then, the original acts of parliament could be resorted to, and read at the bar, for the purpose of correcting clerical or other errors in the printed copy, I see no reason why a similar practice ought not to be sanctioned for any other purpose. Judges are bound to take notice of a general law, and it is their province to determine whether it be a statute or not; for, as against a general statute, nut tiel record cannot be pleaded, but it must, be tried by the judges who are to inform themselves in the best way they can; and if there be any difficulty or uncertainty, they are to make use of ancient copies, transcripts, books, plead *405 ings, or any other memorial, for that purpose. (Dwarr. on Stat. 630, 631.) It is declared by the revised statutes, that, “ No bill shall be deemed to have been passed by the assent of two-thirds of the members elected to each house, unless so certified by the presiding officer of each house ;” (1 R. S. 156, 3, of tit. 4 ;) and for the purpose of ascertaining whether the act in question was so passed, it becomes necessary to" resort to the original bill on file in the office of the secretary of state, upon an inspection of which it will appear to be certified in the usual form of majority bills. So also by the senate journal of 1840, (pp. 123, 124,) and the assembly journal of the same year, (p. 1466,) it appears that only half of the senators, and less than half of the" members elected to the assembly, voted for the bill upon its final passage. This certainly is as good evidence as the nature of the case will admit of, and in my judgment is sufficient to settle the question that this bill was not passed by u the assent of two-thirds of the members elected to each branch of the legislature.”
From the best examination, therefore, which I have been able to give to this case, I have arrived at the conclusion, that the act of May 14, 1840, on its true construction, does by implication abrogate those parts of the city charter and legislative acts which empower the aldermen to sit as judges of the court of general sessions; that it comes within the spirit and true intent and meaning of the ninth section of the seventh article of the constitution, and consequently required “ the assent of two-thirds of the members elected to each branch of the legislature ;” and that, not having received such constitutional vote, it is void. J am cf opinion, therefore, that-the judgment of the supreme court should be reversed.
Scott, Senator.
The principle on which the decision of the supreme court rests, does not distinctly appear. Mr. Justice Cowen says : “ Were I clear that the power of Alderman Purdy to sit as a judge in the court of general sessions, might be considered strictly a corporate right, within Art. 7, § 9 of the *406 constitution, whether such right were public or private, I might require still further time, or perhaps assent at once to the conclusion that the act of 1840 did not affect his power, for want of a two-third vote. Such a vo.te is required for altering any body politic or corporate.” He agrees with Mr. Justice Bronson, that a two-third vote is required for altering any body politic or corporate; and differs from the opinion of Chief Justice Nelson, as expressed in the case of The People v. Morris, (13 Wend. 325,) who holds that the concluding clause of the ninth section of the seventh article of the constitution applies to private corporations only. Mr. Justice Bronson says, the supreme court has never decided that the constitution did not extend to public corporations ; that this was merely the opinion of the chief justice, for which the court was not responsible. Mr. Justice Cowen differs entirely from both the other judges, and puts his opinion on the ground that the power of holding the court of general sessions is not a corporate right, and therefore not within that clause of the constitution which requires a two-third vote. A majority of the court, however, agree to oust Alderman Purdy from the bench : one of the judges, upon the interpretation of corporate rights, and the other, upon the interpretation of the constitution—neither having a majority of the court to sustain him. I propose to consider both grounds.
Bodies politic, bodies corporate (corpora corporata,) or corporations, are artificial persons, of which there is a great variety subsisting for the advancement of religion, of learning and of commerce; created to preserve entire and forever those rights and immunities, which, if granted only to those individuals composing the body corporate, would, upon their death, be utterly lost and extinct. (1 Black. Com. 467, Chit, ed.) Perpetual succession is the main object to be attained by their creation ; for, says Blackstone, as all personal rights die with the person, and as the necessary forms of investing a series of individuals, one after another, with the same identical rights, would be very inconvenient if not impracticable, it has been *407 found necessary to constitute artificial persons. {Id.) Corporate powers are corporate rights, depending upon the grant, and’ are as various as individual rights.' Corporate rights, whether the corporation be sole or aggregate, lay or ecclesiastical, public or private, are nothing more than individual rights incorporated. Certain lay corporations are created for the good government of towns or particular districts ; {Id. 471 3) and it has been usual to grant, in charters to these corporations, divers franchises, as waifs and estrays, deodands, courts and cognizance of pleas, markets, &c. (Jac. Law Dict. tit. Corporation.)
The notion of corporate rights cannot be confined to the narrow ground of the necessary incidents growing out of a general act of incorporation ; such as the right *e have perpetual succession, to sue and be sued, ro grant or take by grant in the corporate name, to have a common seal, to make by-laws, &c. If these are the “ strict corporate rights” intended to be embraced by the constitution, then I cannot see why every clause of a charter, not within this definition, for whatever purpose inserted, may not be altered or amended by a majority vote. Upon this construction of the constitution, the capital of banks may be reduced or extended, the dimensions of rail-roads and canals, their location, or the time fixed for their completion, may be altered, and all the usual provisions embraced in charters, specifying the very end and design of the corporation, may be amended by a majority vote ; thus removing the check provided by the constitution against the creation, alteration or continuance of any corporation except by a two-third vote.
The act to amend the charter of the city of New-York, passed in 1830, declares, that such parts of the charter of the city &c., and of the several acts of the legislature amending the same, as are not inconsistent with the provisions of this law, shall not be construed as repealed, modified, or in any manner affected thereby; but shall continue and remain in full force. {Sess. Laws of130, p. 129, § 26.) The old charter would have remained in force though no such provision had been made 3 *408 for it is well settled that a new charter dees not merge or extinguish any of the ancient privileges of the old charter. (Haddock's case, T. Raym. Rep. 435, 439.)
The Montgomerie charter was confirmed by the colonial legislature in 1732, (Kent's Charter, p. 97,) and also by the constitution of 1777, (§ 36,) and was further confirmed by the new constitution of 1821, which declares that nothing therein contained shall annul any charters to bodies-politic and corporate, made by the king of Great Britain or his predecessors, or by persons acting under their authority, before the 14th of October, 1775. (Const. of N. Y., Art. 7, § 14.) By the Montgomerie charter, the city of New-York is recognized as an ancient city, and the citizens as a body politic and corporate, by the name of the mayor, aldermen and commonalty of the city of New-York; and, after confirming the ancient powers, it grants to the corporation itself, by the name of the mayor, aldermen and commonalty of the city of New-York, and to their successors forever—not to the aldermen or any one of them—that the said mayor, deputy-mayor, recorder, and aldermen of the said city, for the time being, or any four or more of them, (whereof we will the mayor, or deputy-mayor, or recorder of the said city, for the time being, to be one,) shall and may forever hereafter hold and keep four courts of general sessions of the peace, in and for the said city and county of New-York, to begin at certain times in the year, to wit,” See. (See Kent's Charter, p. 68, 69, § 26.) The power thus given is clearly a corporate right; and the words used in granting it are essentially the same as in that clause of the charter conferring legislative power, which provides that the mayor or recorder, with four or more aldermen, and four or more assistants of the said city, for the time being, shall be forever called the common council of the city of New-York, &c. and shall have power to make and form all such laws, &c. {Id. p. 54, § 14.) In both cases the grant is to the corporation ; some of the corporators being named to exercise the powers. I am at a loss to perceive why the power given to the corporation *409 to hold a court, through the mayor, deputy-mayor, recorder and aldermen, should be construed as not being a corporate • right; while the power granted to the corporation to legislate, through the mayor, recorder, aldermen and assistants, is decided to be a corporate right. The power to hold a court, given to a corporation, is as much a franchise, as the right to hold a legislative session.
The act of May 14th, 1840, prohibits the aldermen of ihe city of New York from setting as judges of the court of general sessions; and, if valid, alters the charter. Yet we are told by Mr. Justice Cowen, that no attempt is made by statute to abolish the office of alderman, or to diminish his powers as such. But, I ask, are not his office and powers prescribed by the charter ? Can he be deprived of his seat on the bench, any more than of hife seat in the common council, without diminishing his powers ór abolishing his office 1 The powers conferred on the alder mein are grants of power to the corporation ; and, ‘ in this point of view, it is immaterial what belongs to the office of alderman as such. It is enough that he is one of the corporate officers. An abridgment of his power will abridge that of the corporation, because the latter cannot exercise its corporate functions but by and through its officers.
The term alderman does not import legislative more than judicial power. Wé learn from ancient authorities that comes, eeldorman and earl are equivalent words in the Latin, Saxon, and Danish-Saxon languages. In England this officer sat with the bishop at the trial of causes, and, while the latter expounded the ecclesiastical, it was the duty of the former to declare the cominon law. Aldermen sat as justices of assize,- and exercised such powers of government as were conferred by the charters of the cities or towns where they resided, and, in that character, took cognizance of civil as well as criminal matters$ at one time administering the laws which emanated from the British parliament, and at another acting under the code of the corporation laws. (See 1 Hume’s Hist. Eng. p. 69 ; Jacobs’ Law Dict. tit. Alderman.)
*410 The general duties, says Blackstone, of all bodies politic? considered in their corporate capacity, may, like those of natural persons, be reduced to this single one ; that of acting Up to the end or design for which they were created. (Black. Com. 479, Chit, ed.) In the present instance, the “ end or design” is specified in the preamble confirming the charter of 1686? which declares the city of New-York to be an ancient city, and that the citizens thereof have anciently been a body politic and corporate, and should hold, possess and enjoy all and singular the rights, liberties, franchises, privileges and advantages, jurisdiction, courts, powers? offices and authorities? in the before recited grants, 'which they have held or claimed by prescription or otherwise, &c.; and that they shall be and remain a free' city. (See Kent’s Charter, p. 3 et seq.) Thhs it appears that one of the special and expressed designs of creating the corporation in question was, to confer the power of holding a court of general sessions of the peace.
Robertson, in his view of the progress of society in Europe, says, that the forming of cities into communities, corporations or bodies politic, and granting them the privilege of municipal jurisdiction, contributed more, perhaps, than any other cause, to introduce regular government, police? and arts, and to diffuse them over Europe. The feudal government had degenerated into a system of oppression; The usurpations of the nobles were become unbounded and intolerable. Louis le Gros, in order to. create some power that might counterbalance these potent vassals who controlled or gave law to the crown, first adopted the plan of conferring new privileges on the towns situated within his own domain. These privileges were called charters of community, by which he enfranchised the inhabitants? abolished all marks of servitude, and formed them into corporations or bodies politic, to be governed by a council and magistrates of their own nomination. These magistrates had the right of administering justice within their own precincts, of levying taxes &c. As soon as the towns were enfranchised, arid formed into bodies corporate, they became legal and independent members of the *411 constitution, and acquired all the rights essential to freemen. (See 1 Rob. Charles V. p. 24, 26, 29, N. Y. cd. of 1804.) We here find the reason why our ancestors, imbued with the true spirit of liberty, enumerated the “ taking away [of J our charters” in their list of grievances against the British crown; why, in framing the old constitution, they were so solicitous to preserve our chartered privileges ; and why the framers of the new constitution, in the same spirit, advancing a step further, introduced the clause requiring a vote of two-thirds of the legislature to create or alter any body politic or corporate.
It will be seen that the constitution makes no distinction, in terms, between public and private corporations. But it is said, the object of the clause requiring a tworthird vote was to,prevent the multiplicity of banks. If this be so, why were they not specially enumerated, or an exception made exempting public corporations from the general provision 1 The evils to be apprehended from the alteration of a public corporation are far greater than any which would be likely to flow from altering a mere private corporation ; for the one would affect only a few individuals, the other a whole community. Hence, the inhabitants of cities and towns have been careful to retain in all their charters the recitals of their ancient liberties, franchises, and free customs; because they know and understand the operation of these upon their interests and happiness. Hence, also, it has been the policy, in territorial cessions and in conquests, to retain the ancient usages of the people.
To my mind there is much more reason for applying the two-third clause of the constitution to public, rather than to private corporations, in order to shield the former against sudden and arbitrary encroachments upon their ancient customs. Nothing appears to me more inconsistent than that the framers of the constitution intended to allow the chartered rights of a great community, consisting of more than three hundred thousand souls, to be altered by a bare majority vote ; while at the same time they required the assent of two-thirds of the members elected to each branch of the legislature to amend or alter *412 the incorporation of a petty turnpike or toll-bridge. When we reflect that the language of the constitution is free from ambiguity, the construction sought to be put upon it appears to be still more violent.
Judge Story says, in speaking of the constitution of the' United States, (and his language is equally applicable to our state constitution,) u The people adopted the constitution according to the words of the text in their reasonable interpretation, and not according to the private interpretation of any particular men.” (1 Story’s Com. on Const. 392, note.) He also remarks : “ "jVhere the words are plain and clear, and the sense distinct and perfect arising on them, there is generally no necessity to have recourse to other means of interpretation. It is .only where there is some ambiguity or doubt arising from .other sources, that interpretation has its proper office.” (Id, p. 384.) “ Where the words of a man express his meaning, plainly, distinctly and perfectly, we have no occasion to have recourse to other means of interpretation. But sometimes a pian’s words are obscure ; sometimes they are ambiguousand sometimes they express his meaning so imperfectly, as either to fall short of his intention and not express the whole of it, or else to exceed his intention and express more than he designed. In any of these cases we must have recourse to some other means of interpretation ; that is, we must make use of some other signs or marks, besides the wprds of the speaker or the writer, in order to collect his meaning.” (See 2 Ruth. Inst., ch. 7, § 2.) “ If the words and the construction of a writing are clear and precise, we scarce pall it interpretation to collect the intention of the writer frpm thence. But the definition of interpretation will best inform us whether it is to be called by this name, or not.” (Id. § 4.)
By adopting these principles, so clearly expressed by two eminent jurists, and applying them to the two-third clause of the constitution, not a doubt remains as to its meaning. The clause is as follows : “ The assent of two-thirds of the members elected to each branch of the legislature shall be requisite *413 to every bill appropriating the public monies or property for local or private purposes, or creating, continuing, altering, or renewing, any body politic or corporate.” (Const. of N. Y., Art. 7, § 9.) These words are so plain, and their meaning so clear, that, had there been no attempt to explain them away, I should consider it a work of supererogation to enlarge on this point. If the words “ altering or renewing any body politic or corporate” may be construed to mean one kind of corporations only, viz. private corporations, why may we not make another distinction, and say that the words do not apply to sole corporations ! or another, that they do not relate to lay, but only to spiritual corporations! and then, refining still more in our love of spiritualization, explain “ any body” to mean no body 1
The construction contended for is the reverse of what the constitution plainly imports.—“ Every bill continuing, altering &c. any body politic” &c. Johnson says the word a every” means each one of all, and gives this example : “ All the congregation are holy, every one of them. Numbers.” The same lexicographer defines “ any” to mean every, and says, “it is, in all its senses, applied indifferently to persons or things.” Now, the construction contended for by the defendants in error would make the words “ every bill altering or renewing any body politic or corporate,” mean some bills and some corporations, instead of all bills and all corporations. But, to my mind, the words are so plain that, in the language of Story and Pvutherforlh, there is no necessity of resorting “ to other means of interpretation.”
Where the words of a law are dubious, they may be explained by resorting to the context; (Co. Litt. 381; Stowel v. Zouch, Plowd. 353, 365 5 Crespigny v. Wittenoom, 4 T. R. 790, 793 ;) but the words under consideration are not ambiguous, and therefore, under no reasonable pretgnce, can this rule be applied to fritter away the natural and obvious sense of the constitution. However, if we apply the rule to this case, and seek to ascertain the meaning of the words by examining the *414 context, it will be found that in every section of the constitution where the words “ every” and “ any” are used, it is in the sense defined by Johnson. The word “ every” occurs fifteen, and “ any” twenty-five times in the constitution, and in no instance is either of them used in a limited sense, as meaning some ; but, on the contrary, they are invariably employed in the sense of all, or each one of all. I will cite only a few examples. “ Every bill which shall have passed the senate and assembly, shall, before it become a law, be presented to the governor,” &c. “If any bill shall not be returned by the governor within ¿ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law,” &c. (Const. of N. Y. Art. 1, § 12.) “He [the governor] shall communicate by message to the legislature at every session,” &c. (Id. Aft. 3, 4.) “ Where the duration of any office is not prescribed by this constitution,” &e. (Id. Art. 4, § 16.) “ Any amendment, or amendments to this constitution, may be proposed ip the senate or assembly,” &c. {Id. Art. 8.) “ Any bill may orjgipate in either house of the legislature,” &c. {Id. Art. 1, § 8.) “ So that every district shall have one senator of each class.” {Id. § 5.) “No other oath, declaration or test, shall be required as a qualification for any office of public trust.” {Id. Art. 6, § 1.) “ In every trial on impeachment or indictment, the party accused shall be allowed counsel as in civil actions.” “ No person shall be subject, for the same offence, to be twice put in jeopardy of life or limb : nor shall he be compelled, in any criminal case, to be a witness against himself,” &c. {Id. Art. 7, f> 7.) “ Every citizen may freely speak, write,” &c. {Id. § 8.) It will thus be perceived, if the construction contended for in reference to the clause in question be adopted as a general rule of interpretation, it will at once abrogate the constitution.
It appears to me not within the power of man to select from . fhe English language words more exactly fitted to convey the idea that all corporations, both public and private, "were intepdec} to be embraced by the constitution, than those actually *415 employed ; an intention expressed and declared in the convention which framed the constitution, when the clause in question was under discussion. (Carter and Stone’s Debates, p. 446.) I have searched the journals of both houses since the adoption of the constitution, and have been unable to find a single case, beside the present, where a public corporation has been either created, continued, altered or renewed, except by a two-third Vote.
It was said by counsel, that the office of judge comes from the state, that the people'make the aldermen, and that it was not the intention of the constitution to place judicial officers in the city of New-York upon a different footing from those in other parts of the state. The answer is : The constitution intends what it expresses. Mayors and aldermen, elected by the people, have sat and now sit as judges in criminal courts in most of the cities of this state. The revised statutes enact, that the first judge, mayor, recorder and aldermen of the city and county of New-York, may hold a court of general sessions 5 and the same provision is extended to other cities of the state. (2 R. S. 216, § 27.) This provision, so far as it is applicable to the city of New-York, is merely declaratory of its charter ; and if the act of 1840 repealed this part of the revised statutes, it did not repeal the charter. But it repealed neither, for it is admitted that it was passed by a mere majority vote.
The seventh section of the fourth article of the constitution, declaring that all judicial officers, except justices of the peace, shall be, appointed by the governor and Senate, has been supposed to deprive aldermen of the power to sit as judges in the court of general sessions. This clause, when taken in connection with the fifteenth section of the same article, declaring that 66 all officers heretofore elected by the people, shall continue to be elected,” mustbe considered as excepting from the operation of the seventh section all elective judicial officers ; thus preserving to the people of the city of New-York the right heretofore exercised under the charter and laws of electing aldermen, who have always exercised judicial powers. By giving to the sev *416 enth section the broad construction contended for, we should abrogate the judicial powers of every mayor and alderman in the state. Nay more, we should in effect declare, that for twenty years past they have usurped the power of judges, and that a majority perhaps of the tenants of our state prisons ought to be discharged because committed by courts having no constitutional power to try them. The revised statutes, which were enacted soon after the adoption of the constitution, and a constant series of legislative acts ever since, conclusively show the exposition which has uniformly been given to the sections under consideration.
When the people gave us a written constitution^ they did not intend we should look out of the instrument for a construction of their will. One of the very objects they had in view was to avoid obscurity and ambiguity. I concur entirely in opinion with Mr. Justice Bronson. He has discussed this Whole question, involving a great constitutional principle, with a clearness and force of argument which will hereafter be regarded not only as a model of judicial reasoning, but a noble effort in favor of constitutional liberty.
The judgment of the court below ought to be reversed.
Huger, Senator.
This case comes here from the supreme court on a writ of error, upon an information in that court, in the nature of a quo warranto, to enquire by what authority or right, if any, Elijah F. Purdy held and exercised the office of judge of the court of general sessions in the city and county of New-York.
More than a hundred years ago, Governor Montgomerie granted a charter to the city of New-York, authorizing the aldermen of that city, together with certain other officers, to hold courts of general sessions of the peace 5 and by virtue of the charter, and several subsequent acts p'assed by the legislature, the aldermen have sat as judges in said cotift ever since. It is admitted that Purdy was an aldermaii of the city at the time *417 this proceeding was instituted against him j but it is contended that his right to sit as a member of said court was taken away by an act of the legislature passed May 14th, 1840, entitled an act “ for the better organization of the criminal courts in the city and county of New-York.”
The first section of the act provides that, “ The court of general sessions in the city and county of New-York, shall hereafter be held, and all the powers thereof exercised, by the recorder of the city of New-York and two judges to be appointed by the governor and senate, who shall be called and known as the associate judges of the court of general sessions of the city and county of New-York.” The fourteenth section repeals some of the provisions of the revised statutes, one section of the act of 1833, “ and all other acts and parts of acts inconsistent with the provisions of this act”— i. e. the act of 1840.
The repealing clause, being thus limited to legislative acis and parts of acts, does not restrict the powers granted by the charter of 1730. The first section, however, declaring that the court u shall thereafter be held and all the powers thereof exercised” by the recorder and two judges to be appointed by the governor and senate, would seem, at least indirectly, to work a repeal of so much of the charter of 1730 as authorized aldermen to sit in the court of general sessions. That charter is under the control of the legislature, subject to alteration, amendment or repeal, the same as legislative enactments in relation to chartered rights and privileges, and by the same vote. Hence, if the act in question has the binding force of a law, it is very certain that the aldermen of the city of New-York are deprived of their right to sit as judges in the court of general sessions.
But has that act the binding force of a law 1 It is conceded that it did not receive “ the assent of two-thirds of the members elected to each branch of the legislature.” The question then is, whether the act be such as required a two-thirds vote, under the constitution of this state. The ninth section of the seventh *418 article of the constitution provides, that “ The assent of two-thirds of the members elected to each branch of the legislature shall be requisite to every bill &c„, creating, continuing, altering or renewing any body politic or corporate.” It is contended that this provision does not extend to public corporations ; and that therefore the act of 1840 required only a majority vote. This seems to be a new construction ; for the opinion has been, I may say, almost universal for the last twenty years, that the section extended as well to public as to private corporations. At the time the constitution was adopted, we had then, as we have now, both public and private corporations j and the language of the clause in question would seem to extend as distinctly to the one as to the other. The course of legislation, moreover, for about twenty years previous to 1840, has given a construction to this section of the constitution in strict conformity to its plain meaning ; recognizing its applicability alike to both classes of corporations. Had the convention which framed the constitution intended to except public corporations, the exception would doubtless have been made in direct terms. But instead of this, the language used precludes the idea that any such thing was intended. There are no qualifying words, either in the section itself, or in other parts of the instrument, restricting the provision to private corporations; but the phraseology is comprehensive and unambiguous, embracing every bill altering any body politic or corporate. If this language be not broad enough or strong enough to restrain the legislature, it is hardly possible to conceive what language would be so.
That the aldermen should be allowed to sit as judges in the court of general sessions of the peace, is a right granted to the Corporation, as well as to the aldermen themselves ; and how that right can be taken away without altering the body politic and corporate, within the plain meaning and language of the constitution, I am entirely unable to conceive.
To maintain the constitution is our first duty ; and if the legislature has, for any cause, encroached upon that sacred instrument) or if an erroneous construction has been given to it, we *419 are imperatively called upon to declare its meaning, and to assert its supremacy. Nothing can be more dangerous to our free institutions, or to the rights of the people, than to encourage doubtful interpretations of the constitution, contrary to its more plain and natural import, as understood by the great body of its readers. The view taken of this question by Mr. Justice Bronson is worthy that able and enlightened jurist; and his opinion should be attentively read by every individual in our state who considers the constitution worth preserving.
When this case was before the supreme court, (2 Hill’s Rep. 43,) Mr. Justice Bronson came to the following conclusion, in which I entirely agree ; viz.: “ If the act of 1840, does not exclude the aldermen from the courts of general sessions, there has then been no usurpation ;” but “ if the act of 1840 does exclude the aldermen, it is because it alters the charter of the city under which they hold their seats in the courts of general sessions, and then as the act did not receive the requisite number of votes, it is void.” In either view, Purdy is entitled to to his seat as a judge of said court; and the judgment of the supreme court should therefore be reversed.
Root, senator, delivered a written opinion in favor of affirming the judgment of the supreme court.
On the question being put, “ Shall this judgment be reversed 1” the members of the court voted as follows •
For reversal: Senators Bartlit, Clark, Corning, Dennis-ton, Ely, Franklin, Johnson, Paige, Roger, Scott, Strong, Varían, and Varney—13.
For affirmance : The President, the Chancellor, and Senators Dixon, Hopkins, Hunt, Nicholas, Peck, Platt, Rhoades, Root, and Works—11.